**S. J. GROVES & SONS CO. v. UNITED STATES.**

**No. 45910.**

Court of Claims.
March 4, 1946.

O. R. McGuire, of Washington, D. C., for plaintiff.

J. J. Sweeney, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and WHITAKER, JONES, LITTLETON, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff had a contract for the construction of an earth-filled dam at Grassy Lake, Idaho. It sues in its first cause of action for $23,615.70, which it alleges is the excess cost it incurred as the result of encountering conditions in the borrow pits from which the earth was to be obtained which were unknown and which were of an unusual nature materially differing from those ordinarily encountered.

For its second cause of action it sues for $70,000, additional costs alleged to have been incurred as the result of alleged misrepresentations by the defendant as to the length of the season in which work could be performed.

1. We shall consider first the claim that unknown conditions were encountered.

Prior to advertising for bids the defendant had dug certain test pits at the dam site and also at the borrow pit where it expected to obtain substantially all of the earth necessary to erect the dam. Most of the test pits in the borrow pit area were dug to a depth of from 10 to 12 feet, but one of them was dug to a depth of 20 feet. None of them disclosed the presence of a material known as rhyolite, although this material was encountered at the dam site, which was about 2,500 feet away. The test pits in the borrow pit area indicated that the materials there were satisfactory for use in the dam and the defendant's representatives accordingly concluded that substantially all of the material necessary to erect the dam could be obtained in this area; and when plaintiff's representatives visited the site they were so informed by the representative of the contracting officer. However, plaintiff soon encountered a very hard material, which turned out to be rhyolite, just below the depth to which the test pits had been dug. This material was so hard that it could not be removed by a power shovel.

Plaintiff called this to the attention of defendant's construction engineer, who requested plaintiff to give him a proposal for blasting the material. At the same time a sample of it was sent to Denver, Colorado for examination. Plaintiff furnished the proposal; but, after an examination of the material, defendant determined not to use any of it that had to be removed by blasting. This made it necessary to obtain additional material from other areas. Accordingly, the defendant designated additional borrow pits Nos. 1A, 1B, 1C, and 3, from which earth was to be obtained. Plaintiff placed in the dam a total of 447,570 cubic yards of material, exclusive of the gravel. Of this amount 230,810 cubic yards were obtained from borrow pit No. 1; 127,008 cubic yards from borrow pit No. 1A; 42,322 cubic yards from borrow row pit 1B; 8,810 cubic yards from borrow pit 1C; and 38,620 cubic yards from borrow pit 3.

Borrow pits Nos. 1A and 1B were north of the dam site and in the same general locality as borrow pit No. 1, but across a canyon from it. This made it necessary to construct a new road from these borrow pits. Borrow pit No. 3 was in an entirely different location from pit No. 1, and it was, therefore, necessary to construct a separate road to it. In addition, it was necessary to clear the additional borrow pit areas and to construct drainage ditches in one of them. These and other things are said to have increased plaintiff's costs of securing the borrow material in the amount for which it sues.

Plaintiff did not make a claim for these excess costs until August 10, 1939, at which time its representatives visited defendant's office at Denver. As a result of this visit Mr. F. F. Smith and Mr. H. A. Parker visited the dam on August 25, 1939. Mr. Parker up until just before this time had been the contracting officer's representative in charge of this work; but he had recently been succeeded in this capacity by Mr.

F. F. Smith. These two men, with Mr. Jerman, defendant's construction engineer, made a careful inspection of the borrow pit areas. As a result thereof plaintiff's representatives were told by both Mr. Smith and Mr. Parker to finish the work and at its conclusion to submit a claim for the excess cost, and that it would be approved if it was found to reflect the excess cost actually incurred. Plaintiff did so; but its claim was orally rejected by the contracting officer, Mr. S. O. Harper, who was the superior of both Mr. Smith and Mr. Parker.

Subsequently, the construction engineer wrote plaintiff enclosing a final voucher and release, which it was requested to execute. Plaintiff executed both, reserving, however, its claim for excess cost and also a new claim for $70,000, which it alleged was the additional expense to which it had been put as a result of the defendant's alleged misrepresentations as to the length of the working season.

Plaintiff, treating this letter as a decision on its claim, then filed an appeal with the Secretary of the Interior. This appeal was referred by him to the contracting officer and that official on March 15, 1941 rejected the entire claim in writing. The plaintiff then took an appeal from this formal rejection.

After the exchange of certain correspondence between the head of the department and the contracting officer relative to this appeal, this latter officer on September 5, 1941 mailed a report to the head of the department, in which he said, after further investigation and reconsideration, that he was now of opinion that an adjustment in the contract price in the sum of $23,615.70 was warranted, because it was believed by all of the parties prior to entering into the contract that borrow pit No. 1 would yield the necessary quantity of acceptable materials; and he recommended that this sum be paid. He reaffirmed his former decision that plaintiff's claim for $70,000, asserted in the second cause of action, was without merit.

This recommendation of the contracting officer was approved by the head of the department, and the contractor's claim was certified to the Comptroller General for direct settlement. The Comptroller General, however, refused to certify it for payment.

The parties agree that the decision of the head of the department is final and conclusive unless it was arbitrary or capricious or so grossly erroneous as to imply bad faith. The defendant says that it was so grossly erroneous as to imply bad faith.

We shall assume that this is one of those decisions which is final and conclusive, unless arbitrary or capricious or so grossly erroneous as to imply bad faith, and we proceed to determine whether it was grossly erroneous, as alleged.

The rights of the parties are defined in article IV of the contract. In pertinent part it reads as follows: "Should the contractor encounter, or the Government discover, during the progress of the work, * * * unknown conditions of an unusual nature differing materially from those ordinarily encountered * * * the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and (or) difference in time resulting from such conditions."

The question presented to the contracting officer and the head of the department was whether or not there had been encountered "unknown conditions of an unusual nature differing materially from those ordinarily encountered." They found that such conditions had been encountered. The question presented to us is whether this decision was so grossly erroneous as to imply bad faith.

There is no doubt about the fact that the test pits in the borrow pit area did not disclose the presence of this rhyolite. It is true that its presence at the dam site 2500 feet away was known, but its presence at the borrow pit area was not known. It was believed that substantially all the necessary materials could be obtained from this area. Defendant's engineer and representative of the contracting officer so stated to plaintiff's representatives. He made the same representation to plaintiff's subcontractor who was to do the necessary excavation. If he thought that rhyolite might be present, he either thought it was so far down in the ground that the neces-

sary material could be obtained from above it, or he thought it itself was suitable material for use in the dam. It turned out that this was not so.

We, therefore, think the contracting officer and the head of the department were correct in saying that conditions were encountered which were unknown. The conditions encountered were different from those that were believed to exist; it was expected that all of the necessary material could be secured from this area; but it turned out that, on account of the presence of this rhyolite and the determination that it was unsuitable material for the earthfill, only 46.9 percent of the necessary material could be obtained therefrom. They, therefore, held that the contractor had encountered "unknown conditions of an unusual nature differing materially from those ordinarily encountered."

■ We cannot say that this decision was so grossly erroneous as to imply bad faith. We do not think there is any doubt but that plaintiff encountered conditions which were different from those which he was justified in believing did exist. This justified the head of the department in making an equitable adjustment under article IV of the contract.

2. Plaintiff's second cause of action is for the additional costs it alleges it incurred as the result of alleged misrepresentations by the defendant as to the time within which the work could be performed. It alleges that it was led to believe that the work could be performed in two working seasons, whereas three were necessary. This, it says, added to its costs in the sum of $70,000.

In paragraph 23 of the specifications it is stated: " * * * A tentative construction program has been prepared by the Government and is shown on the drawings, which program, if followed, will result in the completion of the work within the period of time specified in paragraph 21. * * *"

This period of time was 450 days from the receipt of notice to proceed. It was also stated that the construction program "is based on an assumption that notice to proceed will be received by the contractor on September 1, 1936."

This construction program, which was attached to the specifications, showed when the work could commence in 1936, and when it should be completed in 1937. It showed that work on 8 of the items could be performed between September 1 and December 1, 1936, and that all of the work could be completed in the following working season between May 1 and December 1 of 1937.

As it turned out, plaintiff was not given notice to proceed until June 12, 1937, and work was discontinued in October 1937 on account of the weather. It was resumed sometime in June 1938 and was discontinued on October 6 of that year for the remainder of the winter season. It was resumed on June 29, 1939, and finally completed on October 14, 1939.

Plaintiff claims the right to recover the excess cost incurred as the result of having to perform the work in three seasons instead of two, within which it claims the Government represented the work could have been performed.

There is no doubt about the fact that weather conditions made it impossible to work as long as defendant's construction program had indicated, but paragraph 23 of the specifications expressly stated: " * * * The construction program shown on the drawings is tentative only, and the Government assumes no responsibility for any use that bidders or the contractor may make thereof or for any deductions or conclusions that may be made from the program. The tentative construction program is included in the drawings solely to assist bidders and the contractor in preparing their own construction programs. * * *"

The drawing containing the tentative construction program also contained this note at the bottom thereof: "This construction program is tentative. It is included in the drawings solely to assist bidders and the contractor in preparing a construction program for their use."

■ Plaintiff is therefore plainly precluded from asserting that by this "tentative construction program" the defendant warranted that work could be performed in the time shown therein. Defendant made no representation as to the time within which work could be performed in any one year. This, of course, varied from year to year. Defendant would not have been so foolish as to warrant what the weather would be, especially in this locality of exceptionally heavy snows.

Plaintiff is not entitled to recover on its second cause of action.

Judgment will be entered in plaintiff's favor in the sum of $23,615.70. It is so ordered.

JONES and LITTLETON, Judges, concur.

WHALEY, Chief Justice, concurs in the result.

MADDEN, Judge, took no part in the decision of this case.